UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC GAMBLE, : | |
|     Plaintiff, : | |
| : | |
| v. : | CASE NO. 3:20-cv-1273 (KAD) |
| : | |
| GARCIA, et al., : | |
|     Defendants. : | |

**MEMORANDUM OF DECISION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 30]**

Kari A. Dooley, United States District Judge

    On September 1, 2020, the plaintiff, Eric Gamble ("Gamble"), commenced this civil rights action. Following initial review, the Court permitted a First Amendment retaliation claim against Officer Garcia and an Eighth Amendment deliberate indifference to health and safety claims against Captain Rodriguez and Counselor Supervisor Long to proceed. Pending before the Court is the defendants' motion for summary judgment. Therein, the defendants argue that Gamble failed to exhaust his administrative remedies on any of the claims asserted; Gamble cannot establish the elements of any claim, and in any event, the defendants are protected by qualified immunity. On August 19, 2021, Gamble filed his opposition to the motion for summary judgment. For the following reasons, the motion is GRANTED.

**Standard of Review**

    A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Which facts are material is determined by the substantive law.  *Anderson*, 477 U.S. at 248.  "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense …." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  He cannot "rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted).  To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts[1]**

On April 1, 2020, Gamble was housed in North Block 1 at Cheshire Correctional Institution ("Cheshire"). Doc. No. 30-2 ¶ 11. Captain Rodriguez was the Unit Manager of North Block 1 and North Block 2 at Cheshire in April 2020. *Id.* ¶ 8. On April 1, 2020, Captain Rodriguez learned at the morning meeting that inmate workers were needed at Northern Correctional Institution ("Northern"). *Id.* ¶ 12. All unit managers were directed to announce the need to inmates in their housing units and see if any inmates were interested in transferring to Northern on a temporary basis for a work detail. *Id.* ¶ 13.

The same day, Captain Rodriguez made the announcement to the inmates in North Block 1 and several inmates, including Gamble, volunteered for the work detail. *Id.* ¶ 14. Captain Rodriguez provided the names to the warden at Cheshire and a counselor supervisor in the classification and records unit to determine whether the inmates met the criteria to be transferred to Northern. *Id.* ¶ 15.

Defendant Rodriguez was not working at Northern, did not visit Northern in April 2020, did not know what duties would be assigned to the inmates on the work detail, and was unaware of and had no control over their conditions of confinement at Northern; he only made the

---

[1] The facts are taken from the defendants' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3.

The defendants informed Gamble of this requirement. *See* Notice to Self-Represented Litigant Concerning Motion for Summary Judgment, Doc. No. 30-3. However, despite this notice, Gamble did not include a Local Rule 56(a)2 Statement with his opposition. Thus, the defendants' statements are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.").

3

announcement as directed.  *Id.* ¶¶ 16-20.  Nor did Gamble send any written communication to Captain Rodriguez regarding the conditions of confinement, job duties, or contracting COVID-19.  *Id.* ¶ 21.

Northern is a level-5 facility and inmates confined there do not have clearance to perform duties including janitorial, kitchen work, and grounds work.  *Id.* ¶ 22.  Prior to the COVID-19 pandemic, inmates from a nearby lower-security facility would go to Northern each day to perform these jobs.  *Id.*  In March 2020, the Department of Correction limited the movement of inmates as a result of the pandemic and this practice was stopped.  *Id.* ¶ 23.  To replace the workers from the lower-security facility, the Department of Correction issued the request for temporary work details.  *Id.* ¶ 24.

Counselor Supervisor Long and Officer Garcia was assigned to Northern in April 2020. . *Id.* ¶ 9-10.  Counselor Supervisor Long oversaw the work detail process.  *Id.* ¶ 25.  She was responsible for ensuring that there were enough inmate workers at Northern, all job duties were covered, and inmates were assigned to jobs appropriate for their classifications.  *Id.* ¶ 25.

 On April 2, 2020, several inmates from Cheshire, including Gamble, transferred to Northern.  *Id.* ¶ 26.  Gamble remained at Northern until April 16, 2020, when he transferred back to Cheshire.  *Id.* ¶ 27.  All the inmates from Cheshire were housed in the same housing unit.  *Id.* ¶ 28.  The unit was separate from the units housing inmates already confined at Northern and separate from the units housing inmates who had tested positive for COVID-19.  *Id.*

In April 2020, the Department of Correction decided to house all inmates testing positive for COVID-19 at Northern and several housing units were designated as COVID-19 units.  *Id.* ¶ 29.  Inmates who tested positive and were symptomatic were housing in the COVID-19 units and

4

no other inmates were permitted to enter the units. *Id.* ¶ 30. Indeed, most staff also did not enter the COVID-19 units. *Id.* ¶ 31. Only authorized medical staff and the Northern tactical unit, all wearing personal protective equipment, were permitted in the units. *Id.* These staff members entered the facility through a separate entrance that led directly to the units to avoid contact with other inmates or staff. *Id.*

Since the inception of the pandemic, Northern has followed the recommendations of the Department of Correction Central Office, including the recommendations of the Director of Medicine and medical staff as well as the CDC recommendations for correctional facilities, to implement measures and protocols to limit the spread of COVID-19. *Id.* ¶ 32. For example, Northern suspended visits and group programs, increased cleaning and disinfecting, screened staff entering the facility, and established quarantine procedures. *Id.* ¶ 33. Although a quarantine procedure was in place in April 2020, no inmates other than those transferred to the COVID-19 units from other facilities tested positive for the virus in that month. *Id.* ¶ 34.

Shortly after Gamble arrived at Northern on April 2, 2020, he was assigned to a work detail. *Id.* ¶ 35. The work detail did not have a direct supervisor. *Id.* However, his unit counselor was responsible for ensuring that Gamble got paid and would address any issues he had with his work assignment. *Id.* Gamble was not required, or even permitted, to enter the COVID-19 units or be around inmates testing positive for COVID-19. *Id.* ¶ 36.

At no time while he was at Northern, did Gamble complain to Counselor Supervisor Long or Officer Garcia about COVID-19 or state that he was exposed to COVID-19. *Id.* ¶ 37. Nor did Gamble make any complaints to either defendant about showers or report that he was denied showers. *Id.* ¶ 38. All inmate workers in Gamble's unit, including Gamble, were allowed

to shower each day after their shifts according to the Northern shower schedule.  *Id.* ¶ 39.  The schedule was established to ensure that COVID-19 risks were mitigated.  *Id.*

The only issue Gamble raised with Counselor Supervisor Long was that he was promised certain accommodations or privileges at Cheshire and he was upset that these promises were not met at Northern.  *Id.* ¶ 40.  Gamble never asked to be tested for COVID-19 and Counselor Supervisor Long never refused to have him tested.  *Id.* ¶ 41.  The decision to test an inmate for COVID-19 is made by the medical staff in accordance with COVID-19 protocols and Counselor Supervisor Long had no control over whether Gamble would be tested.  *Id.* ¶ 42.  If Gamble had requested testing from Counselor Supervisor Long, she would have referred him to the medical unit.  *Id.* ¶ 43.  Counselor Supervisor Long was not aware that Gamble was being exposed to COVID-19 positive inmates in April 2020 or that the protocols were not being followed regarding Gamble.  *Id.* ¶ 47.

Counselor Supervisor Long did not tell Gamble that he could not quit his work assignment or threaten a disciplinary report if he did so because the jobs were voluntary and no inmate was required to work.  *Id.* ¶¶ 44-45.  On April 15, 2020, Gamble asked Counselor Supervisor Long for a transfer.  *Id.* ¶ 45.  She agreed to Gamble's transfer and was in the process of submitting a request for him to be transferred back to Cheshire, a process usually completed in a few days.  *Id.* ¶ 46.  However, before the request was processed, Gamble received a disciplinary report and was returned to Cheshire on April 16, 2020.  *Id.*

Officer Garcia issued Gamble a disciplinary report for threats on April 15, 2020.  *Id.* ¶ 48.  Prior to April 15, 2020, Gamble had respectful interactions and no issues with Officer Garcia.  *Id.* ¶ 49.  The only complaint Gamble made to Office Garcia was that the recreation schedule had

changed and he was upset that he no longer went to recreation immediately after his work shift. *Id.* ¶ 50. Officer Garcia had no control over the recreation schedule. *Id.* ¶ 51. Gamble never complained to Officer Garcia about showers or said he intended to write to the warden about any issue. *Id.* ¶ 52.

On April 15, 2020, Officer Garcia was in Gamble's housing unit assisting in securing inmates in their cells as they returned from their work shifts. *Id.* ¶ 53. Gamble was agitated about the change to the recreation schedule and stated: "I am going to pop on one of those dudes and make them send me out of here." *Id.* Officer Garcia understood this statement as a threat to harm another inmate and issued a disciplinary report for threats. *Id.* ¶ 54. The disciplinary report was issued for this reason only. *Id.* ¶ 56. Gamble was transferred back to Cheshire on April 16, 2020. *Id.* ¶ 57.

Gamble filed only one grievance in April and May 2020. *Id.* ¶ 74. That grievance, which was returned without disposition for failure to show attempts at informal resolution, concerned the actions of Ms. McMahon relating to Freedom of Information requests. *Id.* ¶¶ 74-79.

**Discussion**

The defendants move for summary judgment on three grounds, the failure to exhaust administrative remedies, the failure state cognizable claims for relief, and qualified immunity. In his memorandum in opposition, Gamble addresses only whether he has stated cognizable claims. Because the Court concludes that Gamble did not exhaust his administrative remedies, the Court does not take up the alternative bases asserted.

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies *before* a court may hear his case. *See* 42

U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 1174, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion"; the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"); *Timmons v. Schriro*, No. 14-CV-6606 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("The law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

The Supreme Court has held that the requirement for proper exhaustion is not met when a grievance is not filed in accordance with the deadlines established by the administrative remedy policy. *Jones*, 549 U.S. at 217-18 (citing *Woodford*, 548 U.S. at 93-95). In addition, exhaustion of administrative remedies must be completed before the inmate files suit. *Baez v. Kahanowicz*, 278 F. App'x 27, 29 (2d Cir. 2008). Completing the exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001).

Special circumstances will not relieve an inmate of his obligation to comply with the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 136 S. Ct. at 1858. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation marks and internal citations omitted).

The *Ross* Court identifies three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not

9

appear to be exhaustive[.]" *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016).  In considering the issue of availability, however, the court is guided by these illustrations.  *See Mena v. City of New York*, No. 13-CV-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Exhaustion of administrative remedies is an affirmative defense on which the defendants bear the burden of proof.  *See Jones*, 549 U.S. at 216.  Once the defendants establish that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him under *Ross*, or present evidence showing that he did exhaust his administrative remedies.  *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability").

The general inmate grievance procedure is set forth in Administrative Directive 9.6 that may be found at http://portal.ct.gov/DOC/AD/AD-Chapter-9.  This procedure is applicable to all of Gamble's claims as all defendants are custody officers and staff.  An inmate must first attempt to resolve the matter informally.  He may attempt to verbally resolve the issue with an appropriate staff member or supervisor.  Dir. 9.6(6)(A).  If attempts to resolve the matter verbally are not effective, the inmate must make a written attempt using a specified form and send the form to the appropriate staff member or supervisor.  *Id.*  If an inmate does not receive a response to the written request within fifteen business days, or the inmate is not satisfied with the response to his request, he may file a Level 1 grievance.  Dir. 9.6(6)(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.* The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. Dir. 9.6(6)(I). The Unit Administrator may extend the response time by up to fifteen business days upon notice to the inmate on the prescribed form. Dir. 9.6(6)(J).

The inmate may appeal the disposition of the Level 1 grievance by the Unit Administrator, or the Unit Administrator's failure to dispose of the grievance in a timely manner, to Level 2. Dir. 9.6(6)(G), (I) & (K). The Level 2 appeal of a disposition of a Level 1 grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. Dir. 9.6(6)(K). The Level 2 appeal of the Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1 grievance was filed by the inmate and is decided by the District Administrator. Dir. 9.6(6)(M).

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or Level 2 appeals to which there has been an untimely response by the District Administrator. Dir. 9.6(6)(L).

In support of their motion, the defendants have submitted the declaration of Mykia Cooper, the Administrative Remedies Coordinator at Cheshire. She reviewed the grievance log and found that Gamble submitted only one grievance during the period from April 1, 2020 through July 31, 2020. That grievance was returned to him without disposition because he did

not provide evidence that he had attempted to resolve the issue informally before filing the grievance.  Gamble did not correct this issue and refile the grievance.  Defs.' Mem. Ex. B., Cooper Decl., Doc. No. 30-5 ¶¶ 11-17.  Even if he had, the grievance dealt with the denial of Freedom of Information requests for video footage, which is not an issue in this case.  Defs.' Mem. Ex. C, Doc. No. 30-6 at 3.  As the attempted grievance does not address any issue in this case, it cannot serve to exhaust Gamble's administrative remedies even if it had been properly filed..

The defendants also have submitted the declaration of Jaclyn Saunders, the Administrative Remedies Coordinator at Northern from January 2019 through June 2021.  Defs.' Mem. Ex. D, Saunders Decl., Doc. No. 30-7.  Gamble filed one grievance on May 8, 2020 at Cheshire which was forwarded to Northern because it related to Gamble's confinement at Northern.  *Id.* ¶ 12.  The grievance was rejected as untimely filed.  *Id.* ¶ 13.  The appeal also was denied as untimely filed.  *Id.* ¶¶ 14-15.  Gamble filed no grievances during the two weeks he was confined at Northern.  *Id.* ¶¶16, 18.

Gamble signed the Level 1 grievance on May 8, 2020.  In it, he complained that he was required to work around COVID-19 positive inmates with no training, had to wait for hours after his shift to shower, was threatened with disciplinary action when he complained, and was issued a disciplinary report on April 15, 2020.  Defs.' Mem. Ex. E, Doc. No. 30-8 at 3.  The grievance was rejected as untimely because Gamble began working at Northern on April 4, 2020 and filed his grievance more than 30 days after.  *Id.* The Court disagrees with this determination as it is impossible, on the face of the grievance for Gamble to have encountered all of the issues identified in the grievance by April 4, 2020.  Indeed, he did not receive the disciplinary report

until April 15, 2020. The grievance was therefore, at least in part, timely filed and the Defendants offer no explanation as to why his arrival date somehow started the clock ticking on issues which arose after his arrival.

Indeed, Gamble raised this very argument in his grievance appeal. *id.* at 4. However, Gamble acknowledged therein that he received the decision on his Level 1 grievance on July 2, 2020, but did not sign the Level 2 grievance, *i.e.*, his grievance appeal, until July 10, 2020. *Id.* The grievance appeal was denied as untimely because the directive requires that a Level 2 grievance be filed within five calendar days from the receipt of the Level 1 decision. As Gamble was required to comply with the procedural rules at all levels of the grievance process, his failure to timely file his grievance appeal establishes that he did not properly exhaust his administrative remedies.

In his memorandum, Gamble states only that he was denied "Grievance protections, request returns..." Doc. No. 33 at 2. He provides only a narrative of his views and concedes that he cites no law and makes no reference to the defendants' motion or exhibits. *Id.* at 4-5. With respect to the exhaustion issue, Gamble does not challenge the fact that his grievance appeal was filed too late. He does not state that he filed any other grievances or explain how he was denied the protection of the grievance process. To the contrary, the fact that he did file grievances during this period shows that the grievance process was available to him.

As Gamble was required to comply with the procedural rules at all levels of the grievance process, his failure to timely file his grievance appeal shows that he did not properly exhaust his administrative remedies. The Court concludes that summary judgment should be granted on this ground.

**Conclusion**

Defendants' motion for summary judgment [**Doc. No. 30**] is **GRANTED** on the ground that Gamble did not properly exhaust his administrative remedies before commencing this action.

**SO ORDERED** this 25th day of August 2021 at Bridgeport, Connecticut.

/s/
Kari A. Dooley
United States District Judge